UNITED STATED DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

| | |
|---|---|
| **JASMIN NAPPI**, <br><br> Plaintiff, <br><br> – against – <br><br> **PFNY, LLC**, <br><br> Defendant. | Civ. Action No. 23-1237 <br><br> **COMPLAINT** <br><br> <u>**JURY TRIAL DEMANDED**</u> |

Plaintiff Jasmin Nappi hereby alleges the following against Defendant PFNY, LLC ("PFNY" or the "Company") in support of her claims of gender discrimination, sexual harassment, and unlawful retaliation:

<u>**PRELIMINARY STATEMENT**</u>

1. Plaintiff Jasmin Nappi is a dedicated former Member Service Representative at PFNY, LLC d/b/a Planet Fitness (the "Company"), a Planet Fitness gym franchisor.

2. Sadly, on February 7, 2022, Ms. Nappi was sexually assaulted at work by an employee named Desiree Williams.

3. Ms. Williams, who by this time had a well-established reputation of behaving in a sexually inappropriate manner in the workplace, grabbed Ms. Nappi from behind without warning or consent, violently pulled Ms. Nappi towards her, and rubbed her private, intimate, pelvic area against Ms. Nappi's rear-end and backside.

4. This disturbing, wholly uninvited conduct left Ms. Nappi shocked and frozen in horror.

5. Sadly, this heinous attack was easily preventable. Company management knew that Ms. Williams regularly engaged in inappropriate sexualized conduct in the workplace but

did absolutely nothing to address or correct this behavior, all but inviting the sexual assault against Ms. Nappi.

6. Although Ms. Nappi immediately reported Ms. Williams' heinous assault (which was caught on surveillance video), it was not until over a week later that Ms. Williams was fired

7. Incredibly, after her termination, Ms. Williams continued to harass and threaten Ms. Nappi, including by repeatedly calling Ms. Nappi's cell phone, and even by showing up to the gym where Ms. Nappi worked to confront her.

8. Rather than take action to stop Ms. Williams' threatening behavior, such as report her conduct to the police, the Company instead astoundingly informed Ms. Williams that Ms. Nappi had requested to be transferred to another location – a request Ms. Nappi made privately and in confidence to Company management. As such, Ms. Nappi has had to live under fear that Ms. Williams would find and assault her.

9. Furthermore, ever since Ms. Nappi engaged legal counsel to assist her in vindicating the violation of her rights, the Company has blatantly retaliated against her for engaging in protected activity, which has culminated in her recent unlawful firing.

10. Specifically, within days after Ms. Nappi confidentially notified the Company that she had engaged legal counsel and warned the Company against retaliating against her in any way because of this decision, a Company General Manager named Adrienne McAllister badmouthed and disparaged Ms. Nappi and discussed her legal claims with other employees in the workplace. Ms. McAllister described Ms. Nappi to colleagues as "having an issue with Planet Fitness" that the Company was trying to resolve but in turn "ended up trying to sue the company which is not gonna win."

11. As a result of these retaliatory remarks, Ms. Nappi was ostracized by her colleagues, and her reputation was significantly damaged.

12. Then, after Ms. Nappi notified the Company in November 2022 that she was preparing to commence the instant action, the Company's campaign of retaliation only intensified.

13. For instance, Ms. Nappi suddenly noticed that her work hours had been inexplicably cut.

14. Then, on December 28, 2022, the Company rid itself of Ms. Nappi once and for all, by firing her under the thinnest of pretexts. On that day, Ms. Nappi's manager notified her that the Company had decided to fire Ms. Nappi and a male colleague for allegedly failing to account for a gym member who had camped out in the gym's "Black Card Spa" area at the time the gym closed, locking the member inside the gym. The member ultimately called the police to come and free him, and later filed a complaint with the Company.

15. However, Ms. Nappi had done nothing wrong herself in this episode, and was simply following the standard operating procedures that had been established at that gym. In fact, the area in which the member in question was trapped was the responsibility of Ms. Nappi's colleague, who himself had been the subject of multiple complaints about his poor attitude and work ethic, and propensity to fall asleep at work.

16. Nevertheless, Ms. Nappi was unlawfully lumped together with her troubled (and clearly expendable) colleague and summarily fired without having the opportunity to explain what had happened. Notably, the first time Ms. Nappi even learned that a gym member had been locked inside the gym and that the police were called was when her manager fired her, two

weeks after the incident took place, indicating that the Company had no interest in getting to the bottom of what had happened.

17. Ms. Nappi's manager, who observed Ms. Nappi's shocked reaction to the sudden news, tacitly acknowledged that Ms. Nappi was not at fault and that she had no choice but to terminate Ms. Nappi's employment because "corporate [was] saying to just get rid of them both."

18. As such, the Company took advantage of an unfortunate mistake to retaliate against Ms. Nappi once and for all for engaging in protected activity. In fact, Company employees had engaged in far more damaging and destructive conduct, such as yelling in the faces of gym members and creating an atmosphere so dangerous that the police had to be called, but were not disciplined, much less summarily fired. Ms. Nappi was treated differently purely because of her decision to vindicate her rights and engage in protected activity.

19. It almost goes without saying how Ms. Nappi has been demoralized and left to suffer from severe emotional distress because of Ms. Williams' conduct, the Company's failure to protect her, and the Company's subsequent retaliatory conduct culminating in the unlawful, pretextual termination of her employment.

20. As a result, Ms. Nappi brings this action to seek redress for the unlawful employment practices committed against her, including Defendants' discriminatory treatment towards him due to her sex/gender, as well as unlawful retaliation due to her complaints of sexual harassment, in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e ("Title VII"), the New York State Human Rights Law, N.Y. Exec. Law §§ 290 et seq. ("NYSHRL"), and the New York City Human Rights Law, N.Y. City Administrative Code §§ 8-101 et seq. ("NYCHRL").

## ADMINISTRATIVE REQUIREMENTS

21. On March 28, 2022, Ms. Nappi filed a Charge of Discrimination against Defendant with the Equal Employment Opportunity Commission ("EEOC") concerning the allegations of discrimination, sexual harassment, and retaliation alleged herein.

22. On November 16, 2022, the EEOC issued Ms. Nappi and Notice of Right to Sue.

23. This action is being commenced within 90 days of Ms. Nappi's receipt of her Notice of Right to Sue.

## JURISDICTION AND VENUE

24. This Court has jurisdiction over this matter pursuant to 28 U.S.C. § 1331 as this action involves federal questions regarding the deprivation of Ms. Nappi's rights under Title VII. The Court has supplemental jurisdiction over Ms. Nappi's related claims arising under New York law pursuant to 28 U.S.C. § 1367(a).

25. Venue is proper in this district pursuant to 28 U.S.C. § 1391(b) because: (i) PFNY resides in this district; and (ii) a substantial part of the events or omissions giving rise to this action, including the unlawful employment practices alleged herein, occurred in this district.

## PARTIES

26. Plaintiff Jasmin Nappi is a former employee of PFNY, who last worked for Defendant at its Mahopac, New York gym location. Ms. Nappi is an adult resident of the state of New York. At all relevant times, Ms. Nappi qualified as an "employee" under all relevant statutes.

27. PFNY is a foreign limited liability corporation. PFNY is a franchisor, owner, and operators of numerous Planet Fitness gym locations throughout the metro New York area. PFNY is owned by Jeff Innocenti, James Innocenti and Gino LaVerghetta. At all relevant times,

PFNY controlled the terms and conditions of Plaintiff's employment, qualifying as an "employer" of Ms. Nappi under all relevant statutes.

## FACTUAL ALLEGATIONS

**I.** **Ms. Nappi's Strong Performance at Planet Fitness**

28. Ms. Nappi was hired by the Company in August 2020 as a Member Service Representative at its 2228 Church Avenue gym location in Brooklyn, New York (the "Gym").

29. At all times, Ms. Nappi performed her job admirably, receiving nothing but positive praise for her work. Ms. Nappi even earned raises to her salary in recognition of her strong and dedicated performance.

**II.** **The Company Fails to Address or Prevent Desiree Williams' Sexualized, Inappropriate Conduct in the Workplace Despite Having Knowledge of Her Predatory, Sexualized Behavior**

30. The Company hired Desiree Williams in or around September 2021, also as a Member Service Representative.

31. Almost immediately, Ms. Williams, who is believed to be gay, began subjecting Ms. Nappi, other colleagues, and even Gym members to a sexually hostile and harassing work environment.

32. Among other things, Ms. Williams would routinely make inappropriate, uninvited sexualized remarks to and/or about certain Gym members.

33. For instance. Ms. Williams would tell certain members about how their **"ass[es] look[ed] nice."**

34. She would also remark to Ms. Nappi and other colleagues that, had she not been in a relationship at the time, she surely would have entered sexual relationships with certain members.

6

35.  Ms. Williams would even tell certain male Gym members to **"pull up [their] pants or else [she'll] bite,"** referring to their behinds.

36.  Further, Ms. Williams would openly flirt and behave in sexually provocative ways with Gym members, such as by inviting members to sit close to her behind the Gym's front desk while she suggestively fed them food.

37.  In addition, Ms. Williams would openly talk about her sex life in the workplace without invitation, including intimate details about her sexual encounters and sexual partners.

38.  For instance, she once told Ms. Nappi that she had had sexual relations with a woman who was supposedly in a gang.

39.  Ms. Williams told another colleague about how her **cervix was "hurting"** because she and her partner had engaged in sexual activity the previous night.

40.  Ms. Williams would also openly boast about the wild, "fun times" she would have at night clubs, and how the experiences left her unable to come to work the following day.

41.  While these are just some of many examples of Ms. Williams' sexually harassing conduct in the workplace, there is no question that Ms. Williams' behavior caused virtually every Gym employee with whom she came into contact, including Ms. Nappi, to feel extremely uncomfortable and offended – a fact that management knew but did nothing to address.

42.  Troublingly, the Gym's General Manager, Jaliyl Phillips, regularly witnessed Ms. Williams' sexually provocative and inappropriate behavior in the workplace but did not take action to curtail or correct it.

43.  Mr. Phillips routinely observed Ms. Williams openly discuss her sex life with employees and Gym members and was even privy to rumors that Ms. Williams had an ongoing intimate relationship with a Gym member.

7

44. Mr. Phillips was also made aware that Ms. Williams exposed her breast to another employee at the Gym in late-November to early-December 2021.

45. Most significantly, Ms. Nappi and other Gym employees complained on numerous occasions to Mr. Phillips about Ms. Williams' conduct and how her sexualized behavior at work offended them and made them feel uncomfortable.

46. Yet, despite this awareness, the Company never reprimanded Ms. Williams about her behavior or took any meaningful corrective action, which only emboldened her.

### III. The Company Fails to Intervene Against Ms. Williams' Sexually Harassing Behavior, Culminating in Her Sexual Assault of Ms. Nappi

47. Ms. Nappi complained to Mr. Phillips about Ms. Williams' inappropriate, sexualized behavior for months, but no corrective action was taken, allowing the misconduct to continue unabated and a sexually hostile work environment to fester.

48. Ultimately, on February 7, 2022, while the two were working, **Ms. Williams suddenly got behind Ms. Nappi and grabbed her by the waist, forcibly pulled Ms. Nappi into her body, and vigorously rubbed her private, pelvic area against Ms. Nappi's rear-end and back side in a manner that suggested she was deriving sexual pleasure.**

49. This disgusting act left Ms. Nappi in shock. Like many victims of sexual assault, Ms. Nappi was unable to process what Ms. Williams – an employee with a long history of engaging in inappropriate sexualized conduct in the workplace – had done to her without her consent.

50. After Ms. Nappi was able to gather her bearings, she orally reported what Ms. Williams had done to General Managers Alkeny Baez and Adrienne McAllister the next day.

51. Company management, including Area Manager Naida Lopez, reviewed surveillance footage to confirm Ms. Nappi's account.

52. Nevertheless, Ms. Lopez incredibly told Ms. Nappi that the Company could not take any action against Ms. Williams until Ms. Nappi submitted a written complaint.

53. Ms. Williams was finally terminated on or around February 15, 2022.

54. However, Ms. Williams continued to harass Ms. Nappi, whom she blamed for her firing.

55. Ms. Williams repeatedly called Ms. Nappi on the phone, threatening to cause her harm. After Ms. Nappi blocked Ms. Williams' phone number, Ms. Williams resorted to calling her from different or blocked numbers.

56. When Ms. Nappi stopped answering her phone, Ms. Williams began to call coworkers to persuade them into putting her in contact with Ms. Nappi. When that failed, Ms. Williams alarmingly began showing up to the Gym to confront Ms. Nappi in person.

57. As all this was occurring, Ms. Nappi kept the Company abreast of Ms. Williams' harassing and threatening behavior.

58. Ms. Nappi, a mother of two young children, feared for her safety, and privately requested a transfer to a different Planet Fitness location.

59. However, not only did the Company inexplicably fail to take any meaningful action to protect Ms. Nappi, such as by reporting Ms. Williams' threatening behavior to the police, but, for reasons unknown, management shared with Ms. Williams that Ms. Nappi had requested a transfer, further endangering Ms. Nappi.

60. Simply put, the Company failed to meet its legal obligation to prevent Ms. Nappi and her colleagues from being sexually harassed and having to work in a sexually harassing and hostile work environment.

61. Company management knew about Ms. Williams' inappropriate behavior but did nothing to thwart it. But for the Company's failure to comply with its legal responsibilities, Ms. Nappi would not have been sexually assaulted by Ms. Williams.

62. In hindsight, it was not all that surprising that the Gym utterly failed to protect Ms. Nappi and its staff given the barebones and lackluster efforts the Company takes to train its managers on how to properly spot, address, and prevent sexual harassment in the workplace.

63. To wit, Gym managers merely must watch one 45-minute-long video on the topic (the same video shown to rank-and-file employees), with no further meaningful follow-up or training.

64. Clearly, the Company has taken a *laissez faire* attitude towards training its management, which not only contravenes its legal requirements, but, sadly, creates a work environment rife for the kind of heinous and appalling sexual misconduct Ms. Nappi had to endure.

**IV.   Company Management Retaliates Against Ms. Nappi After She Engages Counsel**

65. On March 1, 2022, Ms. Nappi, through counsel, sent the Company a letter describing the Company's unlawful conduct and failure to protect her from sexual harassment and sexual assault.

66. The letter specifically cautioned the Company against retaliating against Ms. Nappi for engaging counsel and requested that the correspondence be treated with discretion so that Ms. Nappi's professional relationships are not harmed.

67. However, within days of the Company receiving Ms. Nappi's correspondence, General Manager McAllister began to disparage Ms. Nappi and discuss her allegations and decision to engage counsel with other employees in the workplace.

68. Specifically, Ms. McAllister described Ms. Nappi to colleagues as "having an issue with Planet Fitness" that the Company was trying to resolve but in turn "ended up trying to sue the company which is not gonna win."

69. These retaliatory remarks served no purpose but to harm Ms. Nappi's reputation, alienate her among her peers, and intimidate her into dropping her claims against the Company.

70. The remarks were made to at least two of Ms. Nappi's colleagues named Naphtaly and Sean. Notably, Naphtaly previously had a positive working relationship with Ms. Nappi and would ask Ms. Nappi questions about how to perform her job, but following Ms. McAllister's retaliatory remarks, refused to even look at Ms. Nappi.

71. The Company's unlawful retaliatory conduct has not only significantly harmed Ms. Nappi's reputation among her colleagues, but has engendered a hostile, "us vs. her" work environment that she must now endure.

72. Furthermore, the Company's campaign of retaliation only intensified after Ms. Nappi notified the Company in November 2022 about her intent to commence the instant action.

73. For instance, the Company suddenly cut Ms. Nappi work hours without explanation.

74. Then, on December 28, 2022, the Company purged itself of Ms. Nappi in a final, conclusive act of blatant retaliation. On that day, the Company fired Ms. Nappi and a male colleague named "Jay P." purportedly because they closed the gym down one night two weeks earlier with a gym member locked inside. The gym member called the police, before lodging a complaint with the Company.

11

75. However, Ms. Nappi was not at fault for what had happened. Rather, the area where the gym member was holed up was Jay P.'s responsibility to check. Ms. Nappi had never been trained by the Company on what procedures she needed to follow when she closed the gym, and she certainly was never told that she needed to check that a colleague had done their job.

76. Notably, Jay P. had just recently began working at the Company for about a month, which was apparently enough time for him to amass multiple complaints from coworkers about his bad attitude, poor work ethic, and inability to stay awake at work. In other words, Jay P. was expendable, and the unfortunate incident that he caused was the opportunity the Company needed to definitively punish Ms. Nappi for engaging in protected activity.

77. Ms. Nappi did not even know that a gym member had been locked inside until she was told so at the time she was being fired. In other words, the Company did not wait or care to hear Ms. Nappi's side of the story or conduct a *bona fide* investigation before jumping to the conclusion that Ms. Nappi needed to be fired. Ms. Nappi's manager practically stated as such, when she explained that she had to terminate Ms. Nappi's employment because "corporate [was] saying to just get rid of them both."

78. Simply, the Company took full advantage of a mistake made by a colleague to retaliate against and oust Ms. Nappi for engaging in protected activity. In contrast, the Company has failed to discipline, much less fire, other employees for engaging in far more serious misconduct, like shouting in the faces of gym members, and engendering a work environment to which the police had to be called.

79. The Company even failed to discipline managers who enabled Ms. Williams to sexually assault Ms. Nappi, as well as those who badmouthed Ms. Nappi and revealed confidential information to her colleagues to isolate and shun her.

12

80.     Such troubling and blatantly retaliatory conduct has and will have a "chilling effect" on the Company's staff and will deter employees from coming forward and reporting or objecting to discrimination and harassment in their workplace.

81.     Ms. Nappi has been left devastated, humiliated, and traumatized by Ms. Williams' actions, the Company's utter failure to protect her, and their campaign of unlawful retaliation culminating in her firing.

82.     The Company turned a blind eye despite having prior notice, effectively giving Ms. Williams free reign to harass and terrorize both employees and members alike with impunity.

83.     Ms. Williams' sexual assault of Ms. Nappi should have never happened had the Company simply complied with its legal responsibility to protect its employees and ensure a safe workplace free of sexual harassment.

84.     Not only that, but the Company added insult to injury by unlawfully retaliating against Ms. Nappi for engaging counsel to safeguard her rights, with the goal of creating an antagonistic and unfriendly work environment that would cause Ms. Nappi to quit.  Ultimately, right at the time Ms. Nappi was preparing to file this lawsuit, the Company chose to terminate her employment under the flimsiest of pretexts, as one law illicit act.

85.     This horrific episode has caused Ms. Nappi to suffer great emotional distress, which has included depression, anxiety, insomnia, and the loss of enjoyment of life and professional accomplishment.

## FIRST CAUSE OF ACTION
### (Discrimination and Harassment in Violation of Title VII)

86.     Plaintiff hereby repeats and realleges each and every allegation in each of the preceding paragraphs as if fully set forth herein.

87. By the actions described above, among other, Defendant has discriminated against Plaintiff in violation of Title VII by, *inter alia*, denying her the equal terms and conditions of employment because of her sex/gender, and by engendering a sex-based hostile work environment within which she had to work.

88. As a direct and proximate result of Defendant's unlawful and discriminatory conduct in violation of Title VII, Plaintiff has suffered, and continues to suffer, monetary and/or economic harm, for which she is entitled to an award of damages.

89. As a direct and proximate result of Defendant's unlawful and discriminatory conduct in violation of Title VII, Plaintiff has suffered, and continues to suffer, mental anguish and emotional distress, for which she is entitled to an award of damages.

90. Defendant's unlawful and discriminatory actions constitute malicious, willful and wanton violations of Title VII for which Plaintiff is entitled to an award of punitive damages.4

## SECOND CAUSE OF ACTION
### (Retaliation in Violation of Title VII)

91. Plaintiff hereby repeats and realleges each and every allegation in each of the preceding paragraphs as if fully set forth herein.

92. By the actions detailed above, among others, Defendant has retaliated against Plaintiff based on her protected activities in violation of Title VII.

93. As a direct and proximate result of Defendant's unlawful and retaliatory conduct in violation of Title VII, Plaintiff has suffered, and continues to suffer, monetary and/or economic harm, for which she is entitled to an award of damages.

94. As a direct and proximate result of Defendant's unlawful and retaliatory conduct in violation of Title VII, Plaintiff has suffered, and continues to suffer, mental anguish and emotional distress, for which she is entitled to an award of damages.

95. Defendant's unlawful and retaliatory actions constitute malicious, willful and wanton violations of Title VII, for which Plaintiff is entitled to an award of punitive damages.

### THIRD CAUSE OF ACTION
**(Discrimination and Harassment in Violation of the NYSHRL)**

96. Plaintiff hereby repeats and realleges each and every allegation in each of the preceding paragraphs as if fully set forth herein.

97. By the actions described above, among other, Defendant has discriminated against Plaintiff in violation of the NYSHRL by, inter alia, denying her the equal terms and conditions of employment because of her sex/gender, and by engendering a sex-based hostile work environment within which she had to work.

98. As a direct and proximate result of Defendant's unlawful and discriminatory conduct in violation of the NYSHRL, Plaintiff has suffered, and continues to suffer, monetary and/or economic harm, for which she is entitled to an award of damages.

99. As a direct and proximate result of Defendant's unlawful and discriminatory conduct in violation of the NYSHRL, Plaintiff has suffered, and continues to suffer, mental anguish and emotional distress, for which she is entitled to an award of damages.

100. Defendant's unlawful and discriminatory actions constitute malicious, willful and wanton violations of the NYSHRL for which Plaintiff is entitled to an award of punitive damages.

### FOURTH CAUSE OF ACTION
**(Retaliation in Violation of the NYSHRL)**

101. Plaintiff hereby repeats and realleges each and every allegation in each of the preceding paragraphs as if fully set forth herein.

102. By the actions detailed above, among others, Defendant has retaliated against Plaintiff based on her protected activities in violation of the NYSHRL.

103. As a direct and proximate result of Defendant's unlawful and retaliatory conduct in violation of the NYSHRL, Plaintiff has suffered, and continues to suffer, monetary and/or economic harm, for which she is entitled to an award of damages.

104. As a direct and proximate result of Defendant's unlawful and retaliatory conduct in violation of the NYSHRL, Plaintiff has suffered, and continues to suffer, mental anguish and emotional distress, for which she is entitled to an award of damages.

105. Defendant's unlawful and retaliatory actions constitute malicious, willful and wanton violations of the NYSHRL, for which Plaintiff is entitled to an award of punitive damages.

## FIFTH CAUSE OF ACTION
**(Discrimination and Harassment in Violation of the NYCHRL)**

106. Plaintiff hereby repeats and realleges each and every allegation in each of the preceding paragraphs as if fully set forth herein.

107. By the actions described above, among other, Defendant has discriminated against Plaintiff in violation of the NYCHRL by, inter alia, denying her the equal terms and conditions of employment because of her sex/gender, and by engendering a sex-based hostile work environment within which she had to work.

108. As a direct and proximate result of Defendant's unlawful and discriminatory conduct in violation of the NYCHRL, Plaintiff has suffered, and continues to suffer, monetary and/or economic harm, for which she is entitled to an award of damages.

16

109. As a direct and proximate result of Defendant's unlawful and discriminatory conduct in violation of the NYCHRL, Plaintiff has suffered, and continues to suffer, mental anguish and emotional distress, for which she is entitled to an award of damages.

110. Defendant's unlawful and discriminatory actions constitute malicious, willful and wanton violations of the NYCHRL for which Plaintiff is entitled to an award of punitive damages.

### SIXTH CAUSE OF ACTION
### (Retaliation in Violation of the NYCHRL)

111. Plaintiff hereby repeats and realleges each and every allegation in each of the preceding paragraphs as if fully set forth herein.

112. By the actions detailed above, among others, Defendant has retaliated against Plaintiff based on her protected activities in violation of the NYCHRL.

113. As a direct and proximate result of Defendant's unlawful and retaliatory conduct in violation of the NYCHRL, Plaintiff has suffered, and continues to suffer, monetary and/or economic harm, for which she is entitled to an award of damages.

114. As a direct and proximate result of Defendant's unlawful and retaliatory conduct in violation of the NYSHRL, Plaintiff has suffered, and continues to suffer, mental anguish and emotional distress, for which she is entitled to an award of damages.

115. Defendant's unlawful and retaliatory actions constitute malicious, willful and wanton violations of the NYCHRL, for which Plaintiff is entitled to an award of punitive damages.

**PRAYER FOR RELIEF**

**WHEREFORE**, Plaintiff prays that the Court enter judgment

A. A declaratory judgment that the actions, conduct and practices of Defendant complained of herein violate the laws of the United States, the State of New York, and the City of New York;

B. An injunction and order permanently restraining Defendant and its partners, officers, owners, agents, successors, employees and/or representatives and any and all persons acting in concert with it, from engaging in any such further unlawful conduct, including the policies and practices complained of herein;

C. An order directing Defendant to take such affirmative action as is necessary to ensure that the effects of these unlawful employment practices are eliminated;

D. An award of damages against Defendant, or any jointly or severally liable entity or person, in an amount to be determined at trial, plus prejudgment interest, to compensate Plaintiff for all monetary and/or economic damages;

E. An award of damages against Defendant, or any jointly or severally liable entity or person, in an amount to be determined at trial, plus prejudgment interest, to compensate Plaintiff for all non-monetary and/or compensatory damages;

F. An award of punitive damages;

G. Pre-judgment interest on all applicable amounts due;

H. Post-judgment interests on all applicable amounts due;

I. An award of costs that Plaintiff incurs in this action, as well as an award of reasonable attorneys' fees to the fullest extent permitted by law; and

J. Such other and further relief as the Court may deem just and proper.

## **JURY DEMAND**

Plaintiff hereby demands a trial by jury on all issue of fact and damages stated herein.

Dated: February 15, 2023
      New York, New York                      Respectfully submitted,

                                                    **FILIPPATOS PLLC**

                                                    By: _____
                                                       Tanvir H. Rahman
                                                199 Main Street, Suite 800
                                                White Plains. New York 10601
                                                T.F/: 914.984.1111
                                                trahman@filippatoslaw.com

                                                *Attorneys for Plaintiff*